MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2018 ME 98
Docket:      Cum-17-448
Argued:      May 15, 2018
Decided:     July 12, 2018

Panel:       ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

KATHLEEN WEST et al.

v.

JEWETT AND NOONAN TRANSPORTATION, INC.

HUMPHREY, J.

[¶1]  The crux of this dispute on appeal is whether, when the defendant has caused a physical invasion of the plaintiff's property, the plaintiff must present evidence of a specific diminution in market value in order to successfully prove nuisance.

[¶2]  Jewett and Noonan Transportation, Inc. (Jewett), appeals from a judgment of the Superior Court (Cumberland County, *Horton, J.*) entered upon a jury verdict awarding Kathleen and Erik West (the Wests) compensatory damages in the amount of $490,000 on the Wests' claim of nuisance.  Jewett contends that the trial court (1) erred when it denied Jewett's motions for judgment as a matter of law on the nuisance claim because the Wests did not present evidence of a specific diminution in market value to their land and (2)

erred or abused its discretion when it allowed the Wests to introduce evidence relating to the conduct of Jewett's insurer in support of the Wests' claims against Jewett. We disagree and affirm the judgment.

## I. BACKGROUND

[¶3] Viewed in the light most favorable to the Wests as the prevailing parties, the following facts were established at trial. *See Batchelder v. Realty Res. Hosp., LLC*, 2007 ME 17, ¶ 3, 914 A.2d 1116. On June 11, 2014, an oil tanker owned and operated by Jewett overturned in a traffic circle in Gorham. As a result of the accident, over 9,000 gallons of oil and kerosene spilled from the tanker into a culvert and onto property belonging to the Wests.

[¶4] The Wests acquired their property, which consisted of twelve acres of land and a house, in 2011 with plans to subdivide and develop the property. Erik West, who previously owned a construction company, had begun to explore development possibilities prior to the spill: he spoke with Gorham's code enforcement officer, hired an engineering company to create preliminary designs for the development, met with Gorham's town planner and with a representative from the engineering company, and discussed the property with four interested real estate developers. After the spill, each of the potential developers lost interest.

[¶5]    The Maine Department of Environmental Protection (the Department) coordinated clean-up efforts between the Wests and Jewett. Jewett assembled a team to handle the remediation that included Jewett's safety director, an engineer and an environmental scientist from an environmental engineering firm, and a representative from Jewett's insurer. By the end of the summer of 2014, Jewett had captured approximately 7,800 gallons of the oil, but tests performed by Jewett's remediation team showed levels of soil contamination in excess of the Department's standards.

[¶6]  In late August 2014, the Wests communicated to Jewett that they wanted Jewett to remediate the remaining oil through excavation.  Although the Jewett team decided that natural attenuation was the most cost-effective means to address the remaining oil and did not think excavation would be necessary, it did not communicate its preferred plan to the Wests at that time.  Meanwhile, Jewett sought extensions of deadlines set by the Department, stalled the performance of the Department's order to excavate,[1] and continued to request additional soil sampling of the spill site, despite the Department's opposition to further sampling.   Eventually, Jewett performed additional sampling in

---

[1] For example, the Jewett team members discussed over email the idea of parking excavation equipment on the property to create the appearance that excavation would be imminent, despite the fact that the team still hoped to avoid excavation altogether.

July 2015. The results of this sampling showed lower contamination levels than the sampling performed in 2014. This supported Jewett's argument for natural attenuation and prompted the Department to determine that excavation was no longer necessary. When Jewett concluded its remediation efforts, roughly 800 gallons of oil remained unaccounted for.

[¶7] On December 7, 2015, the Wests filed a complaint against Jewett alleging claims of (1) common law trespass; (2) statutory trespass; (3) negligence; (4) nuisance; and (5) strict liability; and requesting compensatory, double, and punitive damages. During the pendency of the case, the court granted Jewett's motion for summary judgment on the Wests' claims of statutory trespass and strict liability, but denied Jewett's motions for summary judgment on the remaining claims and also denied the Wests' motion for summary judgment.

[¶8] After a jury was selected, the parties filed seven motions and cross-motions in limine to exclude certain evidence at trial. Relevant to this appeal, the court granted Jewett's motion to exclude evidence of lost profits or other dollar loss as a result of the spill but allowed the Wests to present evidence that the remaining oil inhibited marketing or development of the property. It also denied Jewett's motion to exclude evidence that it was insured

because the Wests merely sought to offer evidence relating to the conduct of the Jewett's insurer on behalf of Jewett during the remediation process, not as evidence that Jewett was insured against liability. *See* M.R. Evid. 411.

[¶9]  A jury trial took place over four days in August 2017.  At the outset, the Wests told the jury that they sought compensatory damages for restoration purposes only.  The Wests' expert, a civil engineer, testified that the restoration would cost $490,000.

[¶10]  When the Wests rested their case, Jewett filed motions for judgment as a matter of law on the Wests' claims for punitive damages and nuisance.  In support of its argument on nuisance, Jewett asserted that it was entitled to judgment because the Wests carried the burden of showing a reduction in the value of the land as an element of nuisance and had failed to present any evidence of a reduction in value.  The court denied both motions.[2]

[¶11]  After both parties rested, the court instructed the jury—without objection—that "[t]he measure for damage to property is ordinarily the cost of restoring the land to its original condition unless the cost is disproportionate to the diminution or reduction in value of the land caused by the trespass or

---

[2]  Jewett renewed these motions for judgment as a matter of law after it rested its case, and the court denied both motions again.

6

nuisance, in which case damages are measured by the difference in value between . . . the land before and after the harm."

[¶12]  The jury returned a verdict in favor of the Wests on their nuisance claim only, awarding them compensatory damages in the amount of $490,000 and declining to award punitive damages.  Jewett renewed its motion for judgment as a matter of law on the nuisance claim and also moved for a new trial, for remittitur, or to amend or alter the judgment.  *See* M.R. Civ. P. 50(b), 59(a), (e).  The court denied these motions and Jewett appealed.

## II.  DISCUSSION

### A.    Nuisance

[¶13]  Jewett argues that the trial court erred when it denied Jewett's motions for judgment as a matter of law on the Wests' nuisance claim because the Wests did not present any evidence of a specific diminution in market value of their land due to the spill.  "We review the denial of a motion for judgment as a matter of law de novo to determine if any reasonable view of the evidence and those inferences that are justifiably drawn from that evidence supports the jury verdict."  *Darling's Auto Mall v. General Motors LLC*, 2016 ME 48, ¶ 11, 135 A.3d 819 (quotation marks omitted).  We view "all of the evidence in the light most favorable to the party opposing the motion"—in this case, the Wests.  *See Profit*

*Recovery Grp., USA, Inc. v. Comm'r, Dep't of Admin. & Fin. Servs.*, 2005 ME 58, ¶ 10, 871 A.2d 1237.

[¶14]  We have adopted the elements for a common law cause of action for private nuisance from the seminal treatise on the law of torts from Prosser and Keeton.  *See Charlton v. Town of Oxford*, 2001 ME 104, ¶ 36, 774 A.2d 366; *see also* Keeton et al., *Prosser and Keeton on the Law of Torts* § 87 at 622-23 (5th ed. 1984).  Those elements are as follows:

> (1)  The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use;
>
> (2)  There was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended;
>
> (3)  The interference that resulted and the physical harm, if any, from that interference proved to be substantial[. . . .]  The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct;
>
> (4)  The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land . . . .

*Charlton*, 2001 ME 104, ¶ 36, 774 A.2d 366 (quoting Keeton et al., *Prosser and Keeton on the Law of Torts* § 87 at 622-23); *see also Johnston v. Me. Energy*

*Recovery Co.*, 2010 ME 52, ¶ 15, 997 A.2d 741 (providing a summary of the elements of nuisance). It is only the third element that is in dispute in this case.

[¶15] When discussing the "substantial interference" requirement, *Prosser and Keeton* distinguishes between an invasion that "affects the physical condition of the plaintiff's land" and conduct that involves "mere physical discomfort or mental annoyance." *See* Keeton et al., *Prosser and Keeton on the Law of Torts* § 88 at 627. For the former, "the substantial or significant character of the interference is not in doubt." *Id.* For the latter, "there is somewhat more difficulty in deciding when the interference is substantial and unreasonable justifying a recovery for damages. Probably a good working rule would be that the annoyance cannot amount to unreasonable interference until it results in a depreciation in the market or rental value of the land." *Id.*; *Charlton*, 2001 ME 104, ¶ 36 n.10, 774 A.2d 366.

[¶16] In this case, the oil spill "affect[ed] the physical condition" of the Wests' land and therefore "the substantial or significant character of the interference is not in doubt." *See* Keeton et al., *Prosser and Keeton on the Law of Torts* § 88 at 627. Because the interference was more than "mere physical discomfort or mental annoyance," the Wests did not need to show a specific "depreciation in the market or rental value of the land." *See Charlton*, 2001 ME

104, ¶ 36 n.10, 774 A.2d 366 (quoting Keeton et al., *Prosser and Keeton on the Law of Torts* § 88 at 627). The Wests satisfied the third element by presenting evidence that (1) the oil physically invaded their land and (2) interest in the development of their property disappeared after the spill—in other words, that the interference caused by the physical invasion was substantial. The trial court therefore did not err when it denied Jewett's motions for judgment as a matter of law on the nuisance claim.

B.     Evidence of the Insurer's Conduct

[¶17]  Jewett also argues that the court erred or abused its discretion when it allowed the Wests to introduce evidence of the conduct of Jewett's insurer at trial. In particular, Jewett contends that, by denying (1) Jewett's motion in limine to exclude evidence of the insurer's conduct and (2) Jewett's motions for judgment as a matter of law on the punitive damages issue, the court improperly allowed the insurer's conduct to form the basis for the Wests' punitive damages claim. Jewett asserts that even though the jury did not award punitive damages, the evidence was prejudicial and influenced the jury's award of compensatory damages on the nuisance claim.

[¶18]  "We afford trial courts 'wide discretion' in making evidentiary rulings, and review for abuse of discretion their rulings on the admissibility of

evidence with respect to its prejudicial effect." *Estate of Nickerson v. Carter*, 2014 ME 19, ¶ 12, 86 A.3d 658.

[¶19]  The court did not err or abuse its discretion when it denied Jewett's motion in limine, which sought to exclude evidence of Jewett's insurer's conduct in support of the Wests' claim for punitive damages.  Jewett argued that the evidence should have been excluded pursuant to M.R. Evid. 411, which provides that "[e]vidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully."  The court correctly determined, however, that the Wests were not offering the evidence as proof that Jewett was insured against liability.  The evidence presented by the Wests that referenced the conduct of the insurer related to their punitive damages claim, and was intended to convince the jury to find, by clear and convincing evidence, that the remediation team assembled by Jewett, which included the insurer, acted with malice when it sought to deceive the Wests during the clean-up process.

[¶20]  Jewett also seems to challenge the notion that the conduct of its insurer could form the basis of Jewett's liability.  The court instructed the jury, without objection, that "[a] corporation may be . . . responsible for the acts of people who are not its employees if the evidence shows that it's more likely

than not that the defendant has ratified those actions by approving the actions or accepting the benefit of those actions, or if the evidence shows that the defendant led the plaintiffs to believe that those other people had the authority to act on behalf of the defendant." Because the Wests presented evidence that Jewett "led [them] to believe" that the insurer "had the authority to act on behalf of" Jewett[3] by placing the insurer on its remediation team, the jury could have reasonably found that Jewett was responsible for the acts of the insurer.

[¶21] Finally, Jewett has failed to show how it was prejudiced by the evidence relating to its insurer. *See Estate of Nickerson*, 2014 ME 19, ¶ 12, 86 A.3d 658. Jewett's motions made prior to, during, and after trial relating to this issue concerned the Wests' claim for punitive damages and the jury did not award punitive damages in this case.[4]

The entry is:

Judgment affirmed.

---

[3] Jewett's safety director testified that Jewett's insurer "was the one that was controlling this"— referring to the role the insurer had in the negotiations between Jewett and the Wests' attorney.

[4] The jury instead awarded damages on the Wests' claim for nuisance in the precise amount the Wests' expert estimated for the cost of recovery. If Jewett had been concerned with whether the conduct of its insurer could form the basis for its own liability, Jewett could have challenged the sufficiency of the evidence to support the first element of nuisance, which requires proof of the defendant's intent to cause or continue the interference. *See Johnston v. Me. Energy Recovery Co.*, 2010 ME 52, ¶ 15, 997 A.2d 741. Jewett did not do so.

Stephen A. Bell, Esq. (orally), Mundhenk & Bell, LLC, Portland, for appellant Jewett and Noonan Transportation, Inc.

Gavin G. McCarthy, Esq. (orally), Catherine R. Connors, Esq., and Katherine S. Kayatta, Esq., Pierce Atwood LLP, Portland, for appellees Erik and Kathleen West

Cumberland County Superior Court docket number RE-2015-247
FOR CLERK REFERENCE ONLY