STATE OF MAINE                          SUPERIOR COURT
PENOBSCOT, ss.                          DKT. NO. PENSC-RE-2017-34

RICHARD W. ROMESBURG, SR. and        )
ANDREA L. ROMESBURG,                 )
                                     )
    Plaintiffs/Counterclaim Defendants,  )
                                     )
v.                                   )   ORDER
                                     )
MATTHEW J. PERKINS and               )
MICHELLE R. PERKINS,                 )
                                     )
    Defendants/Counterclaim Plaintiffs.  )

Hearing was concluded on the parties' complaint and counterclaims on May 17, 2019. The plaintiffs were present and represented by counsel, Jeremy Marden, Esq., while the defendants were present and represented by counsel, Donald Brown, Esq. In the complaint, plaintiffs allege statutory and common law nuisance, and statutory and common law trespass. They have also brought a declaratory judgment count, asking the Court to resolve their boundary dispute with the defendants. The defendants have counterclaimed, alleging abuse of process, negligent and intentional infliction of emotional distress, and intentional trespass. They also ask the Court to assess punitive damages.

BACKGROUND

The Perkinses have owned a camp on Pushaw Lake since 2012. In 2016, the Romesburgs bought the camp to the north. Minor disputes soon arose between the parties over snow plowing and the placement of debris. In the winter of 2017, the Romesburgs' son and some of his friends had disagreements with Mr. Perkins about their placement of ice fishing traps in front of his camp. After one incident in which Romesburg Jr. pointed a hand gun at Mr. Perkins after Perkins had pulled a Romesburg trap out of its hole, the Romesburg-Perkins relationship became extremely adversarial. Following

1

this, Romesburg Jr. and guests engaged in harassing behaviors toward Mr. and Ms. Perkins including making lewd gestures, yelling obscenities, and giving them the finger. The Perkinses dealt with this provocation by installing a fence on the boundary line between the two properties. The Romesburgs claim that this fence was built on their land because the Perkinses are mistaken about the location of the common boundary, hence the filing of the complaint for declaratory judgment.

ANALYSIS

A. Complaint

1. Declaratory Judgment

The first task for the Court is to locate the common boundary because the plaintiffs' success in asserting some of the other counts rises and falls on the location of the common boundary. The parties' surveyors have contrasting views on the location of the boundary and provided somewhat complicated testimony in support of each opinion. They fundamentally disagree only on the location on the earth of one common corner of the parties' deed descriptions, the Romesburgs' southwest corner which is Perkinses' northwest corner; otherwise their conclusions are consistent. Because of this, the boundary dispute can be resolved by the Court's decision on the location of this corner.

The Romesburgs' property abuts the Perkinses' property to the north and they share an east-west boundary line. The lake is directly to the west of both properties and an easement used as a camp road runs between the lake and the west line of the properties. The exact location of the common boundary is dependent on locating its western end. The surveyors agree on the basic length and direction of the common boundary from that point to the east, but, of course, its location is dependent on where it starts. If the opinion of the plaintiffs' surveyor is correct, the Perkinses' fence is located

2

on the Romesburgs' property. If the opinion of the defendants' surveyor is correct, however, the fence is placed exactly on the line.

When the defendants decided to install a fence, they were guided by a 2012 survey in locating it. This so-called "Rice survey" placed their northwest corner on the edge of the camp road. In 2017, the Romesburgs commissioned Allan Gordon to survey their property and he determined that Rice's version of the common boundary was inaccurate, and that the line was actually located a few feet to the south and several feet to the east of the boundary Rice established. The relevant description from the Romesburgs' deed is: "commencing at a stake on the easterly side of a right of way which follows the shore of Pushaw Lake, and which said stake also marks the northwest corner of land heretofore conveyed to Willis Osgood; thence from said point of beginning and in a northerly direction along the easterly side of said right of way 75 feet to a point marked by a stake, said stake being located 32 feet at right angles from the highwater mark of Pushaw Lake." The relevant description from the Perkinses' deed indicates that its southwest corner is marked by an iron pin, "said pin being thirty-five (35) feet from the high water mark of Pushaw Lake and on the easterly side of a way," then to the east, then north, then west back toward the lake to "the easterly side of the way, [this is the Romesburgs' southwest corner], thence southerly by and along said way seventy-five (75), more or less, to an iron pin and point of beginning."

A resolution of the difference between the opinions of McNally, the defendants' expert who supports the Rice survey, and Gordon, who places the common boundary a few feet to the south of the Rice-McNally version of the line, is controlled by locating the proper high water mark of Pushaw Lake. Gordon uses the present high water mark, while McNally uses the high water mark which would have been in existence at the time the deed descriptions were formulated, before the installation of a dam which is now in place.

3

By using the former (lower) high water mark, the 32- and 35-foot measurements are taken from a point that is now submerged, rather than from the present shore. This yields an eastern boundary that is actually on the edge of the camp road, consistent with the phrases found in the descriptions, "commencing at a stake on the easterly side of a right of way" and "along the easterly side of said right of way" (Romesburg) as well as "said pin being . . . on the easterly side of a way" (Perkins) and "southerly by and along said way." Gordon's opinion yields a strip of land between the eastern edge [1] of the way and the western edge of the Romesburgs' and Perkinses' respective properties. [2]

Because the deeds refer to the high water mark of the lake at a time before dam construction, the Court must use its location at that time in determining boundary locations. Additionally, using the older high water mark yields a western boundary that is consistent with other deed description referring to that boundary and is consistent with the beliefs held by prior owners concerning the location of this line. The common boundary between these parties is as depicted in the Rice survey

### 2. Nuisance Claims

The focus of plaintiffs' common law and statutory nuisance claims is the fence. "A private nuisance consists in a use of one's own property in such a manner as to cause injury to the property, or other right, or interest of another." *Johnston v. Me. Energy Recovery Co., Ltd. P'ship*, 2010 ME 52, ¶ 15, 997 A.2d 741. The elements of a nuisance claim

> are as follows: (1) The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) There was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been

---

[1] The relevant deeds and plans contain no dimensions for this easement nor an exact description that places it on the face of the earth.

[2] Gordon indicates that Husson University somehow retains title to this strip, although there is no apparent usage of the strip by anyone other than the parties.

4

anticipated or intended; (3) The interference that resulted and the physical harm, if any, from that interference proved to be substantial[. . . .] The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct; (4) The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land . . . .

*West v. Jewett & Noonan Transp., Inc.*, 2018 ME 98, ¶ 14, 189 A.3d 277 (alteration in original). Statutory nuisance as alleged here is the claim that defendants installed and maintained a fence "unnecessarily exceeding 6 feet in height, maliciously kept and maintained for the purpose of annoying the owners or occupants of adjoining property . . . ." 17 M.R.S. § 2801.

Plaintiffs have failed to prove both claims. It is abundantly clear that Mr. Perkins installed the fence to protect his family from the aggressions of Romesburg family members. The Court finds that Mr. Romesburg Sr. permitted his property to be used by Romesburg Jr. and friends who taunted Mr. and Ms. Perkins, yelled obscenities at them, gave them the finger, drove aggressively when encountering them on the road, and made lewd gestures involving pelvic thrusts toward Ms. Perkins. They also insisted on placing ice fishing traps in front of the Perkinses' cottage as a form of intimidation, culminating in Mr. Perkins also acting irresponsibly at times by yelling back at Romesburg Jr. and friends, and pulling a trap out of hole. The Court is aware that the Perkinses do not own the water and ice in front of their cottage, but, as a warden indicated in his report, it is common for fishermen not to place their traps directly in front of another's camp. This prevents situations in which a confrontation ensues that, as we know, could lead to gun wielding and possible usage.

The Court is aware that Mr. Perkins engaged in relatively minor provocations by exposing the construction side of the fence to his neighbor and installing it directly on the

5

property line, which was ill advised. This does not diminish the basic premise that the fence was not erected to interfere with the Romsburgs' use of their property, and they have not proved common law nuisance. Similarly, they have not proved a violation of the spite fence statute because it was not erected to cause annoyance to the Romsburgs. Even though its height marginally exceeded six feet in some locations, it did not *unnecessarily* exceed six feet in height, and in many locations, Mr. Perkins notched the bottom of the fence when encountering bumps rather than follow the lay of the land and raise the fence over the bump, increasing its height.

### 3. Trespass Claims

In the statutory trespass claim, plaintiffs allege cutting down or damaging of trees and damage to the ground, which could be construed as damage to stones or gravel, in the words of the statute. *See* 14 M.R.S. § 7552. Because the fence was not built on the Romesburgs' property, there is a failure of proof in this regard. "The gist of the action [for common law trespass] is unlawful entry . . . ." *Cook v. Curtis*, 125 Me. 114, 116, 131 A. 204, 206 (1925). Having failed to prove unlawful entry, plaintiffs fail on this count as well.

### B. Counterclaims

### 1. Abuse of Process

The elements of abuse of process include "(1) the use of process in a manner improper in the regular conduct of the proceeding, and (2) the existence of an ulterior motive." *Jennings v. MacLean*, 2015 ME 42, ¶ 6, 114 A.3d 667. "The filing of a lawsuit qualifies as a regular use of process and cannot constitute abuse of process, even if the filing was influenced by an ulterior motive." *Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 23, 901 A.2d 189. Based on this precedent and the fact that a registered surveyor supported the Romesburgs' contention on the boundary issue, counterclaim defendants prevail.

6

2. Negligent and Intentional Infliction of Emotional Distress, Punitive Damages

To prove negligent infliction of emotional distress, counterclaim plaintiffs must prove that counterclaim defendants "owed a duty to [them]; that [they] breached that duty; that [counterclaim plaintiffs] sustained severe emotional distress; and that [counterclaim defendants'] breaching conduct caused that harm." *Steadman v. Pagels*, 2015 ME 122, ¶ 26, 125 A.3d 713. Additionally, in the absence of a bystander liability claim, there must be a special relationship between the parties, *see Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18, which is absent here. This claim fails because there is no duty or special relationship.

In order to prove their intentional infliction of emotional distress claim, the counterclaim plaintiffs must prove

> that (1) [counterclaim defendants] intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [their] conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the [counterclaim] defendant[s] caused the [counterclaim plaintiffs'] emotional distress; and (4) the emotional distress suffered by the [counterclaim] plaintiff[s] was so severe that no reasonable person could be expected to endure it.

*Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210.

As applied here, the Court finds that during the ongoing interactions between these parties, at least counterclaim plaintiff Michelle Perkins suffered such severe emotional trauma, watching Romesburg Jr. pull a gun and point it at her husband, and then enduring taunts, insults and lewd gestures by him and his friends. The problem is that Romesburg, Sr. was not the primary actor. Under the guise of protecting his own property, Romesburg Sr. has installed cameras such that they point toward the Perkinses'

7

property, having the effect of violating their privacy and causing emotional distress. Although a major part of his role in this controversy was to support the actions of those chiefly responsible and then reinforce their actions with milder discourtesies, he went beyond the support of others by placing cameras pointed directly at the Perkinses' camp. The record is devoid of any evidence supporting the need to install such cameras except to cause harm to the Perkinses. In the context of what had been taking place, this conduct is sufficiently outrageous. Because of this, counterclaim plaintiffs have proved this cause of action. Recognizing that Romesburg Sr. was not the primary actor and that Mr. Perkins contributed, at least modestly, to the dispute, the Court awards $1 in damages, and **Orders** that no Romesburg camera be pointed in the direction of the Perkinses' camp such that it captures any image above the top of the fence.

Based on the above characterization of Mr. Romesburg Sr.'s role in causing the harm, the Court declines to award punitive damages because proof of malice by clear and convincing evidence is lacking.

The entry is:

1. The common boundary between the parties' lots is as depicted in the April 10, 2012 survey conducted by Jeffrey Rice.
2. Judgment for the Perkinses on all other Romesburg Counts
3. Judgment for the Romesburgs on Counterclaim Counts I, II, IV, and V. Judgment for the Perkinses on Counterclaim Count III with damages of 1$. No Romesburg camera may be pointed in the direction of the Perkinses' camp such that it captures any image above the top of the fence separating the lots.
4. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: October 2, 2019

WILLIAM ANDERSON
JUSTICE, SUPERIOR COURT

ORDER/JUDGMENT ENTERED IN THE
COURT DOCKET ON: 10 - 8 - 19

8